UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

ERICA RESNIK, MEREDITH HEILBRONN, and
RACHEL AMMER,

                      **Docket No:**

               Plaintiffs,

                      **COMPLAINT**

      -against-

ITN NETWORKS, LLC, ITN HOLDING, LLC and
CRAIG SULEMA,

                      **JURY TRIAL
DEMANDED**

               Defendants.
----------------------------------------------------------------------X

      Plaintiffs, ERICA RESNIK, MEREDITH HEILBRONN, and RACHEL AMMER allege,

upon information and belief, against Defendants ITN Networks, LLC, ITN Holding, LLC and

Craig Sulema as follows:

### INTRODUCTION

      1.     This action seeks redress for the Defendants discriminating against the Plaintiffs,

on the basis of their gender, by paying them substantially less than their male counterparts in

violation of Federal, New York State and New York City laws.

      2.     Plaintiffs, Erica Resnik ("Mrs. Resnik"), Meredith Heilbronn ("Mrs. Heilbronn"),

and Rachel Ammer ("Mrs. Ammer") (collectively "Plaintiffs"), are the only three female

Executive Vice Presidents ("EVPs") at ITN Networks, LLC ("ITN" or "Company"), a business

division of ITN Holding, LLC.  ITN is a media buying company.  Plaintiffs manage ITN's media

buying department, the core function of ITN's business.

      3.     Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer have collectively worked for ITN

for more than 75 years – devoting their careers to the success of ITN.  Each of them has

accumulated a consistent record of stellar reviews at the Company and developed sterling

reputations throughout the industry for their professionalism, industry knowledge and competence. Through their collective hard work and dedication to the Company, they have become the highest-ranking female executives at ITN.

4.      Despite their record of success and loyalty to ITN, however, Defendants have consistently paid them less than each of the Company's male EVPs who have equal or lesser responsibilities at the Company.  To make matters worse, ITN has paid them less than many of its male employees who hold subordinate titles and perform lesser roles.

5.       Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer have raised their gender-pay-inequity concerns multiple times to senior management at ITN.  These complaints have been made to Defendant Craig Sulema ("Defendant Sulema"), their direct supervisor and ITN's Chief Investment Officer, ITN's male Chief Financial Officer ("CFO"),[1] ITN's male Chief Executive Officer ("CEO")[2] and ITN's all-male Board of Directors.

6.      However, the Plaintiffs' concerns have either been dismissed, ridiculed or outright ignored.  When Plaintiffs asked Defendant Sulema to conduct a compensation review to determine whether they were being paid less than male employees who performed similar or lesser roles at the Company, Defendant Sulema refused to undertake the requested review.  Defendant Sulema responded by admitting that the Plaintiffs were paid less than the male EVPs at the Company and by telling Plaintiffs Mrs. Resnik and Mrs. Heilbronn, in substance and in part, that he was not aware that he was required to pay men and women equally for equal work.  When the Plaintiffs raised the unequal pay issue with the male CFO, he also admitted that the Plaintiffs were paid less than their male counterparts but justified it by stating, in substance and in part, that, in his opinion,

---

[1] The male CFO of ITN Networks, LLC is also alternatively referred to in Company communications as the CFO of ITN Holding, LLC.
[2] The male CEO of ITN Networks, LLC is also alternatively referred to in Company communications as the CEO of ITN Holding, LLC or CEO and President of ITN Holding, LLC.

2

all of the male EVPs were more important to the Company than the female Plaintiffs.  Both Defendant Sulema and the CFO expressed concern only over how the Plaintiffs discovered that they were paid less than their male counterparts and questioned whether there had been a data breach at the Company or if Defendant Sulema had accidentally sent them an email that "he shouldn't have."

7.     When Plaintiffs brought their concerns to the Company's CEO, he refused to take any meaningful action to either investigate or remedy the situation.  The Company's Board of Directors also refused to address the Plaintiffs' discrimination concerns.  Plaintiffs wrote to the Board of Directors expressing their concerns over gender-pay inequality at ITN and requested a meeting.  The all-male Board of Directors refused to meet with them.

8.     Unfortunately, the gender-based discrimination encountered by the Plaintiffs which has resulted in each of them being paid less than every male employee at the Company who performs a substantially similar role, is the predictable outcome at a company completely dominated by men.  The Plaintiffs are the only three female EVPs at ITN.  No woman holds a more senior position at the Company.  The C-suite executives are all men.  The Board of Directors is all male.  There are no female EVPs outside of the Buying Department.  The Company's Planning department, Cable Operations department, ProVantageX department, Finance department, Sales department, Information Technology department, Marketing/Research department, Data Analytics department, and Traffic department, are all either run or overseen by men.

9.     It is unsurprising – though wholly unacceptable – that the male-dominated leadership of ITN has responded to the Plaintiffs' concerns over gender-pay equity by embarking on a campaign of retaliation against Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer.

10.     Ever since the Plaintiffs raised their concerns about fair pay, Defendant Sulema, with the knowledge and support of ITN's senior, all-male, leadership team has barraged the Plaintiffs with meaningless tasks for them and the Buying Department to complete.  Defendant Sulema responds to each completed project with baseless criticism and derision.

11.     Furthermore, Defendant Sulema has excluded Plaintiffs from leadership meetings and the meetings he has held with Plaintiffs' direct reports.  Senior male leadership at the Company now refuse to meet with Plaintiffs alone and shun them when encountered in the workplace.

12.     Defendant Sulema, motivated by a particularly disturbing desire to retaliate against Plaintiffs and with reckless disregard for the health and safety of the Plaintiffs and all of the employees in the Buying Department, covertly instructed an unvaccinated junior employee that she could return to the Buying Department in direct violation of Company policy that banned employees who were not vaccinated against COVID-19 from entering ITN's physical workplace. Defendant ITN's and Defendant Sulema's retaliatory actions were intended to make Plaintiffs uncomfortable in the workplace and make it more difficult for the Plaintiffs to perform their jobs with the hope that the Plaintiffs will resign from the Company.

13.     All of the Defendants' retaliatory actions were the result of the Plaintiffs merely asking for a compensation review to determine whether they were being paid fairly and equally as compared to their male counterparts at the Company, as required by law.

14.     Defendant ITN's and Defendant Sulema's conduct constitutes unlawful discrimination and retaliation in violation of the Equal Pay Act of 1963, 29 U.S.C.A. § 206(d)(1) et. seq. ("EPA"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 et. Seq. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et. seq. ("NYCHRL"), and the New York Equal Pay Law, N.Y. L. L. § 194 et. seq. ("NY EPL").

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C §

1331 and 1343, as Plaintiffs have asserted claims that arise under federal laws of the United States.

16.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state and

local law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to federal claims

in this action such that they form part of the same case or controversy.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the actions

complained of took place in the Southern District of New York.

## ADMINISTRATIVE PROCEDURES

18.     Plaintiffs will be filing a charge and/or charges of discrimination with the EEOC as

an administrative prerequisite to asserting claims under Title VII and will file an Amended

Complaint to include claims under Title VII at the appropriate time.

19.     Following commencement of this action, a copy of this Complaint will be served

both on the New York City Commission on Human Rights and the Office of the Corporation

Counsel of the City of New York, thereby satisfying the notice requirements of the New York City

Administrative Code.

## PARTIES

20.     Plaintiff Erica Resnik, is a female resident of New York City, New York. Mrs.

Resnik meets the definition of "employee" and "person" under all applicable statutes.  Mrs. Resnik

is a current employee of ITN and has been an employee of ITN for approximately 26 years.

21.     Plaintiff Meredith Heilbronn, is a female resident of New York City, New York.

Mrs. Heilbronn meets the definition of "employee" and "person" under all applicable statutes.

Mrs. Heilbronn is a current employee of ITN and has been an employee of ITN for approximately 26 years.

22.     Plaintiff Rachel Ammer, is a female resident of Rockland County, New York. Mrs. Ammer meets the definition of "employee" and "person" under all applicable statutes.  Mrs. Ammer is a current employee of ITN and has been an employee of ITN for approximately 24 years.

23.     Defendant ITN, is a limited liability company organized and existing by the laws of the State of Delaware with its principal place of business at 747 Third Avenue, New York, New York 10017.  At all relevant times, Defendant ITN met the definition of "employer" under all relevant statutes.

24.     Defendant Craig Sulema is a male resident of Westchester County, New York. Defendant Sulema holds the title of Chief Investment Officer of Media Operations at ITN.  At all times relevant to this Complaint, Defendant Sulema was the direct supervisor of the Plaintiffs at ITN.  At all relevant time, Defendant Sulema met the definition of "employer" under all relevant statutes, since he acted directly or indirectly on behalf of ITN.

## FACTUAL ALLEGATIONS

### I.     ITN and ITN's Media Buying Department

25.     ITN is a media buying company.  Its core business is the purchase of advertising time on local television stations around the country for its corporate clients. ITN has approximately 150 employees and has annual revenues of approximately $250 million.

26.     ITN's clients, typically large corporations in the consumer products, food or pharmaceutical industries - such as Proctor & Gamble, Pfizer, and Hershey – give ITN a share of their national television advertising budgets which ITN then uses to buy advertising time in more

targeted local television markets.  Depending on what audiences or demographics the client wishes

to reach with their television commercials, ITN will create an advertising strategy for that client.

ITN will promise that, pursuant to this advertising strategy, the client's television commercials

will be viewed by at least a guaranteed minimum number of viewers in the desired demographic.

27.     ITN relies on its Media Buying Department ("Buying Department") to execute

these advertising strategies and make them profitable.  ITN's buyers will negotiate with the local

television stations to obtain the inventory of desired advertising spots, in specific time periods, for

the client's commercials in order to maximize views by the client's desired demographic.

28.     The Buying Department will also negotiate to get the best possible rates for these

advertising spots.  The ability of the Buying Department to both deliver the advertising inventory

that clients require and do so at as low a cost as possible, is largely attributable to not only the ITN

buyers' industry expertise, but also the relationships that they have developed over time with the

advertising sales personnel of the local television stations or the stations' New-York-based sales

representatives.   In executing advertising buys for ITN's clients, the ITN Buying Department

negotiates with and buys advertising time on over 900 local television stations throughout the

United States.

29.     The Buying Department generates profit for ITN through its negotiations with the

local television stations to buy commercial time that will deliver viewer ratings for the client's

desired demographic at a cost that is lower than the price that the client has agreed to pay ITN for

guaranteeing those viewer ratings.  This differential, between the price that a client has agreed to

pay ITN, and the lower cost that ITN's Buying Department is able to obtain, is the profit margin

on each specific client account.  The ability of ITN's Buying Department to obtain advertising

time at a lower cost than what ITN is charging their clients, is the primary generator of profit for ITN's media buying business.

## II.    Plaintiffs' Perform Equal Work to their Male Peers But Get Paid Less Because of their Gender

30.     Plaintiffs, Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer, collectively manage all aspects of ITN's Buying Department.  Mrs. Resnik and Mrs. Heilbronn both hold the title of EVP-Director of Media.  Mrs. Ammer has the title EVP-Dashboard Director.

31.     As EVP-Directors of Media, Plaintiffs Mrs. Resnik and Mrs. Heilbronn manage all of the Buying Department's approximately 50 employees and direct the operations of the Buying Department.  Plaintiffs Mrs. Resnik and Mrs. Heilbronn manage a roster of employees holding job titles ranging from EVP, to Senior Vice President ("SVP"), to Vice President ("VP"), to Associate Media Director, to Senior Media Buyer, to Media Buyer, to Junior Media Buyer, to Assistant Media Buyer.   The Buying Department is the largest department at ITN, consisting of approximately 50 of the Company's 150 employees.   In addition to managing the whole Buying Department, Mrs. Resnik and Mrs. Heilbronn also still run teams that handle buying advertising time for ITN clients in the nation's largest media markets: New York (Mrs. Resnik), Los Angeles (Mrs. Heilbronn), Chicago (Mrs. Resnik) and Washington D.C. (Mrs. Heilbronn).  Plaintiffs Mrs. Resnik and Mrs. Heilbronn report directly to ITN's Chief Investment Officer, Defendant Sulema.

32.     As the EVP-Dashboard Director, Plaintiff Mrs. Ammer manages the Buying Department's software platform called the ITN Portal.  This cloud-based platform which is critical to ITN's buying operation, is used by local television stations to input their current advertising rates and their available inventory.  Plaintiff Mrs. Ammer is responsible for internal and external training on the ITN Portal and managing credentials for over 1,000 platforms users.   On the development side, Plaintiff Mrs. Ammer is constantly updating, modernizing, troubleshooting and

modifying the system to better suit the needs of the Buying Department and the requirements of the platform's television-station users.  In her capacity as the EVP-Dashboard Director, Plaintiff Mrs. Ammer manages a team consisting of an AMD and Senior Media Buyers.  Plaintiff Mrs. Ammer also supervises the ITN Portal Testing Group which is responsible for platform innovation. In addition to these Dashboard-related responsibilities, Plaintiff Mrs. Ammer also manages a media-buying group consisting of a VP, Media Buyers and Junior Media Buyers and Assistant Media Buyers.  Furthermore, Plaintiff Mrs. Ammer also personally handles buying advertising time for ITN clients in the Atlanta, Georgia market, and on broadcast platforms including Dish Network, DirecTV and the CW-100 Network.  Mrs. Ammer reports directly to Mrs. Resnik and Mrs. Heilbronn.

33.     Under the collective management of Plaintiffs, Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer, the Buying Department has consistently delivered excellent results for ITN.  For example, in 2021, the Buying Department purchased $220 million worth of television advertising time for clients, thereby creating tens of millions of dollars in profit for ITN; more than any other department at the Company.  Through the first two quarters of 2022, the Buying Department has already purchased $115 million in television advertising time, putting the Buying Department on pace for a record-breaking year.

34.     To consistently achieve such great results, the Plaintiffs work long hours.  Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer regularly work 50- to 60-hour work weeks.  The pace of the Plaintiffs' work responsibilities increases in the weeks leading up to the start of each new quarter when the majority of television advertisement buys are negotiated and finalized. During these periods, Plaintiffs regularly work 80-hour-plus work weeks to ensure that thousands of television advertisements are efficiently priced and correctly purchased.  Plaintiffs not only

9

handle the negotiations for television advertising buys in each of their markets, but they also supervise and assist all of the other media buyers with their negotiation strategies in an effort to maximize the profitability of their buys as well.  In the weeks leading up to a new quarter, all three Plaintiff's regularly work 12-15 hour days.

35.     In addition, Plaintiffs are responsible for overseeing the entry-level training of the approximately 23 Assistant Media Buyers in the Buying Department.  They also oversee the Junior Buyer Training Program that teaches experienced Assistant Media Buyers how to buy television commercials and prepares them for promotion to the role of Junior Media Buyer.  In overseeing both training programs, the Plaintiffs strive to ensure that these junior-level employees perform their jobs at an expected level of professionalism and excellence.

36.     Another crucial component of the Plaintiffs' job is to develop and foster professional relationships with the local television stations in their respective markets and the sales representative firms based in New York that assist these local stations in selling their advertising inventory.  All three Plaintiffs have developed excellent reputations in their respective markets and the industry in general.

37.     Each Plaintiff, in addition to their long office hours, regularly devoted time (pre-COVID) to meeting with or dining out with the sales personnel or representatives from multiple television markets.  During the COVID-19 pandemic, the Plaintiffs maintained relationships with television sales personnel through video-meetings and conference calls.  The professional relationships that the Plaintiffs fostered through these efforts over the years, not only promoted ITN's reputation for professionalism, but also assisted Plaintiffs in obtaining advertising inventory for their clients, and helped Plaintiffs obtain better advertising rates for the Buying Department which ultimately added to ITN's profits.

38.     Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer perform the same or substantially the same job functions as other male EVPs at ITN, requiring equal skill and effort and are performed under similar working conditions.

39.     In fact, the roles that the Plaintiffs perform are not only equal in importance to, but in many cases more critical to the operations of ITN than the roles performed by many of the male EVPs and SVPs who manage ITN's other departments.  Plaintiffs manage the largest department at ITN.  They are responsible for managing more employees than any other male EVP or SVP. They train more ITN employees than any of the male EVPs or SVPs.  They regularly work longer hours than the male EVPs.  They are responsible for creating a significant portion of the profit that ITN earns each year.  Yet the Plaintiffs get paid less than every male EVP at ITN and even less than many (if not all) of the more junior male SVPs and even some of the male VPs.

40.     As an example, ITN's Cable Operations Department is run by a male SVP and has approximately 7 employees, compared to the approximately 50 employees in the Buying Department.  The Cable Operations Department buys advertising time on approximately five cable providers, compared to the over 900 television stations serviced by the Buying Department. Buying advertising time on cable television is simpler than purchasing advertising time on broadcast television which is handled by the Buying Department.  Unlike broadcast television buying, the work of the Cable Operations Department is largely automated and does not require rate negotiations.  Further, in cable advertising purchases, there are no viewer-rating guarantees and the buyers do not need to find alternative make-good slots for commercials that do not air.  In addition, because the practice of cable buying is platform-facing, developing professional relationships is less important because the buying process does not require person-to-person negotiations.  The Cable Operations Department buys a fraction of the amount of advertising time

that the Buying Department does.  Accordingly, the Cable Operations Department generates a fraction of the profit that the Buying Department creates.  Yet ITN pays the male SVP (a title below EVP) who runs the smaller and less profitable Cable Operations Department more than each of the Plaintiff EVPs.  Defendant Sulema is responsible for setting the compensation level of the SVP who manages the Cable Operations Department.

41.     ITN's Planning Department is co-run by a male SVP and female SVP.  The Planning Department focuses on pricing advertising plans and serves as an intermediary between the Buying Department and the Sales Department.  The Planning Department is an exclusively internal-facing department that does not interact with ITN's clients or the television stations.  The co-managers of the Planning Department, supervise a department of 16 employees.  Consistent with ITN's institutionalized gender bias, the male SVP is paid more than his female counterpart who co-manages the Planning Department.  ITN also pays the male SVP in the Planning Department more than each of the Plantiff EVPs.  Defendant Sulema is responsible for setting the compensation levels for the Planning Department.

42.     ITN's ProVantageX Department is run by two male EVPs.[3]  ProVantageX is a software platform product that ITN has unsuccessfully attempted to sell to competing advertising agencies to streamline and centralize television advertisement purchases.  At its peak the ProVantageX Department had approximately 50 employees.  The ProVantageX Department, a pet

---

[3] When attempting to market the ProVantageX platform, ITN created the fiction that ProVantageX was a separate business entity from ITN.  This was done because potential client buying agencies were resistant to the idea of putting their rate information into a platform that ITN, a competitor, created and would have access to.  However, in reality, ProVantageX was operated as a department within ITN.  The ProVantageX Department reported to Defendant Sulema. The EVPs of the ProVantageX Department attended ITN management meetings run by Defendant Sulema.  Defendant Sulema at times instructed Buying Department employees to work on ProVantageX projects.  At least one employee worked fulltime for both the Buying Department and the ProVantageX Department.  Defendant Sulema at times instructed Buying Department employees to provide the ProVantageX Department with advertising rate information. ITN's Information Technology Department provided support for all ITN departments, including the ProVantageX Department.  Further, ProVantageX employees were transferred into other ITN departments once the ProVantageX Department was downsized.

12

project of Defendant Sulema, was a huge failure, costing ITN hundreds of millions of dollars.  The ProVantageX Department failed to make even one successful sale of its product software platform. On December 8, 2021, the CEO of ITN sent out a company-wide email announcing the dramatic downsizing of the ProVantageX Department, which was subsequently reduced to approximately 14 employees.  During the downsizing, ITN retained the ProVantageX Department's two male EVPs, but terminated the department's sole female EVP.  The two male EVPs who currently run the failing ProVantageX Department are each paid more than each of the Plaintiff EVPs. Defendant Sulema is responsible for setting the compensation levels for the EVPs in the ProVantageX Department and was responsible for the decision to fire the ProVantageX Department's sole female EVP.

43.     ITN's Sales Department is run by a male President of Sales and has two male EVPs. The male President of Sales manages a department with approximately 13 employees.  A principal part of the Sales Department's pitch to potential clients is the expertise and ability of the Buying Department to obtain from local television stations the advertising inventory that clients' require. Further, the profitability of each sale made by the Sales Department is dependent in large part on the ability of the Buying Department to deliver the required inventory at a price lower than what the Sales Department sold it to the client.  ITN pays the male EVPs in the Sales Department, who are not responsible for running their department and supervise fewer employees than the Plaintiffs in the Buying Department, more than each of the Plaintiff EVPs.

44.     ITN's Marketing-Research Department is run by a male employee with the dual titles of EVP and Chief Marketing Officer ("EVP/CMO").  This EVP/CMO manages a department of approximately 6 employees.  The Marketing-Research Department is responsible for tracking the Nielsen ratings of the television programs that run on the local television stations, researching

13

and compiling data for the ITN sales team, maintaining the ITN website and drafting press releases. This EVP/CMO who supervises this small group gets paid more by ITN than each of the Plaintiff EVPs.

45.      In sum, the Plaintiffs, despite performing work that is equal to or more demanding than that performed by their male EVP and SVP colleagues, are each paid less than every male-EVP at the Company and many, if not all of the male-SVPs.  Even some of the male VPs are paid more than each of the Plaintiffs.  The reason for this pay disparity is gender bias and discrimination at ITN.

III.    **Gender Discrimination and Retaliation at ITN**

46.      That Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer are paid less than their male colleagues who perform equal or lesser tasks, is characteristic of the institutionalized gender pay discrimination which exists at ITN.  As the history of each Plaintiffs' employment at ITN demonstrates, women are paid less than men who perform similar roles at every level of the Company.  The Plaintiffs' history also demonstrates that Defendant Sulema, with the support of ITN's senior management intentionally kept the Plaintiffs' compensation at levels substantially below their male colleagues and responded to inquiries about this gender-pay disparity with misrepresentations, hostility and workplace retaliation.

47.      Plaintiffs Mrs. Resnik and Mrs. Heilbronn have worked at ITN for 26 years.  Mrs. Resnik was hired on October 23, 1995, and Mrs. Heilbronn was hired on November 2, 1995. Plaintiff Mrs. Ammer has worked at ITN for 24 years.  She was hired on March 2, 1998.  All three women hold bachelor's degrees.

48.    Each of the Plaintiffs was hired into the Buying Department and began their careers as Assistant Media Buyers, the most junior position in the Buying Department. [4]   Over the last approximately two-and-a-half decades, the three Plaintiffs, through hard work and dedication to the Company, have worked their way up to their current positions as Executive Vice Presidents.

49.    The Plaintiffs are currently the only female EVPs at ITN.  No woman holds a more senior title at the Company.  ITN has no female Presidents or female executives in the C-Suite.

### A.    Plaintiffs are Promoted to Senior Vice President but Denied Pay Increases Because of their Gender

50.    Plaintiffs first became aware of the gender-based pay bias at ITN in late 2014 when all three Plaintiffs were promoted from Vice Presidents to Senior Vice Presidents in the Buying Department.  When their promotions were announced, on December 11, 2014, Defendant Sulema sent out a Company-wide email praising their work, stating that Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer have helped lead the Buying Department "to continued success and advancement" and praised them as "knowledgeable," "dedicated," "loyal," "respected," and "team players."

51.    However, after the promotions were announced, Defendant Sulema told the Plaintiffs that while their promotions would come with increased work responsibility, none of the Plaintiffs would be receiving any increase in their total compensation as a result of their promotions.

52.    On or about the same date, Defendant Sulema promoted a male VP in the Planning Department to the title of SVP.  On information and belief, that male SVP was given a raise along

---

[4] Plaintiff Mrs. Resnik was originally hired by ITN as a receptionist, but after approximately one week was hired into the Buying Department as an Assistant Media Buyer.  Plaintiff Mrs. Heilbronn was also originally hired by ITN as a receptionist.  She served in this role for approximately three months before being hired into the Buying Department. Plaintiff Mrs. Ammer was originally hired by ITN as an entry-level employee in the Finance Department, but moved into the Buying Department after approximately a few months with the Company.

with his promotion.  This male SVP in the Planning Department had work responsibilities equal to or lesser than those of the Plaintiffs, yet Defendant Sulema chose to pay him more than the Plaintiffs because he was a man.  Defendant Sulema also compensated this male SVP in the Planning Department at a higher level than the one female SVP in the Planning Department who was promoted to SVP on the same date, despite both SVPs performing similar roles.

53.    When the Plaintiffs questioned Defendant Sulema as to why they were not receiving raises to match their promotions and additional job responsibilities as SVPs, Defendant Sulema told them, in substance and in part, that, unlike the male who was promoted to SVP, they needed "to be patient."

54.    For the next three years, 2015, 2016, 2017, Plaintiffs did not receive any meaningful increases in their pay despite ably performing their roles as SVPs in the Buying Department.  Each year Defendant Sulema would provide a different reason for why he would not give them a raise that would compensate them appropriately for their SVP titles and responsibilities.  Defendant Sulema, at various points during this period, told the Plaintiffs, in substance and in part, that (a) ITN's Board of Directors did not approve raises for them; (b) ITN's CEO did not approve giving them raises; and (c) Defendant Sulema felt that the money in his budget would be better spent in the ProVantageX Department.  Despite Defendant Sulema's refusal to compensate them at a level equal to the other, male SVPs in the Company, the Plaintiffs performed their SVP roles dutifully and received stellar reviews for their work each year.

55.    During this period, Plaintiff Mrs. Heilbronn learned that a senior employee with fewer responsibilities in the Buying Department was earning approximately $35,000 more per year than her and Plaintiff Mrs. Resnik and approximately $50,000 more than Plaintiff Mrs. Ammer.

16

When Plaintiff Mrs. Heilbronn brought this to the attention of Defendant Sulema, he promised that he would "catch up" the Plaintiffs' salaries to that of the senior employee's salary.

56.     However, Defendant Sulema lied and instead of "catching up" the Plaintiffs to the senior employee's salary as he had promised to do, Defendant Sulema, over the next few years, cut the senior employee's salary by approximately $40,000, until Plaintiffs Mrs. Resnik and Mrs. Heilbronn were each making $200 per year more than the senior employee.  When this was achieved, in 2020, Defendant Sulema went back to the Plaintiffs and mocked them, in substance and in part, that now, based on the $200 per year differential, Plaintiffs Mrs. Resnik and Mrs. Heilbronn should be "happy" because they were making "more" than the senior employee. Plaintiff Mrs. Ammer's salary remained significantly below that of the senior employee.

57.     In or about July 2017, Defendant Sulema promoted a male VP in the Cable Operations Department to the title of SVP.  This male VP was already being paid more than each of the Plaintiffs, despite their promotions three years earlier to the more senior title of SVP. Defendant Sulema gave this male employee a salary increase when Defendant Sulema promoted him from VP to SVP.  This male SVP, despite having job responsibilities that were less than each of the Plaintiffs, was now being paid even more than each of the Plaintiffs.

58.     In or about November 2017, Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer, requested a meeting with Defendant Sulema to discuss, among other issues, the male SVP's recent promotion.  During the meeting, the Plaintiffs asked, in substance and in part, why, three years after their promotions to SVPs they had still not received any salary increase for the promotions whereas the male employee received a salary increase with his promotion to SVP.

59.     Defendant Sulema was dismissive of Plaintiff's concerns.  Defendant Sulema just repeated, in substance and in part, that the Board of Directors had not approved a salary increase

for the Plaintiffs despite their promotions three years prior.  Frustrated with Defendant Sulema's dismissiveness, Plaintiff Mrs. Heilbronn confronted him by asking, in substance and in part, whether the Plaintiffs were being denied salary increases because they were women.  Defendant Sulema responded by laughing.  Plaintiff Mrs. Heilbronn challenged Defendant Sulema as to why he was laughing as her question was serious.  Defendant Sulema quickly ended the meeting.  A few weeks later, the Plaintiffs were given their annual pay adjustment and told that the adjustments contained a belated salary increase for their prior promotions.  However, these increases still failed to bring Plaintiffs to pay parity with male SVPs and VPs who performed similar or lesser work at the Company.

60.    In or about 2018, a male employee in the Finance Department was promoted from VP to SVP.  The promotion was kept secret.  Contrary to Company practice, ITN made no Company-wide announcement of the promotion. The newly-promoted SVP admitted to Plaintiff Mrs. Ammer, in substance and in part, that his promotion was kept secret because the Company wanted to hide it from a female employee in the Finance Department who was passed over for the promotion.  The SVP, who was close personal friends with ITN's male CFO, further stated to Plaintiff Mrs. Ammer, that the Company realized that it had a "women problem" in that the Company had a very poor track record of promoting women to, and retaining them in, senior positions.  This male SVP, who had lesser job responsibilities than Plaintiffs, was given a salary increase with his promotion to SVP and was paid a higher salary than each of the Plaintiffs.

**B.    ITN's Culture of Male Toxicity and Gender Bias**

61.    The institutionalized gender bias at ITN manifested itself not only in compensation and promotion disparities, but also in the way women were treated in the workplace.  Despite being promoted to SVPs in 2014, the Plaintiffs were excluded from senior management meetings that

took place every Tuesday morning. Plaintiff Mrs. Heilbronn was only able to gain admission to the meetings in 2018 (four years after becoming a SVP) because one of the buyers in her group was the then-CEO's daughter and the CEO wanted his daughter to attend the meetings. Since it would have been awkward for such a junior buyer to attend these meetings while excluding her SVP supervisor, Plaintiff Mrs. Heilbronn was permitted to attend.

62.     At these meetings, however, Plaintiff Mrs. Heilbronn frequently found herself marginalized or ignored. At times, the male executives would tell her to give up her seat since she was sitting in a male executive's "chair," despite there being no assigned seating at these meetings.

63.     Other times Plaintiff Mrs. Heilbronn was forced to listen while male executives disparaged the physical appearances of female buyers at external advertising agencies. Plaintiff Mrs. Heilbronn's viewpoints at these meetings were never solicited and ignored when offered. When Plaintiff Mrs. Heilbronn brought her concerns over her treatment at these meetings to Defendant Sulema and told him that she wanted to file a complaint with the human resources department, Defendant Sulema told her there was "really no point in doing that" as no action would be taken in response to such complaints.

64.     The environment of male toxicity at ITN extended outside of the Tuesday senior management meetings. For example, Defendant Sulema and the male CFO, and other male executives at the Company would frequently mock the Buying Department as "the sorority" since most of the female employees at ITN worked in the Buying Department and it was the only one of ITN's departments that was managed by female EVPs.

65.     Defendant Sulema would often intervene in hiring decisions made by the Buying Department, forcing Plaintiffs to pass overqualified female job candidates in favor of less qualified

male hires that he had either "gone drinking with," were former campers at a summer camp where Defendant Sulema held the position of athletic director, or who were friends of his son.

66.     Defendant Sulema would also often intervene to undermine Plaintiffs' personnel decisions in the Buying Department, something he never did in departments run by male managers. For example, on two separate occasions, the Plaintiffs discovered that buyers in the Buying Department had failed to fulfill their assignments and lied about it to Plaintiffs.  One of the offending buyers was a female, who the Plaintiffs fired with Defendant Sulema's agreement and support.  The second offender was male, and his conduct was not only worse than the female employee's, but he also used inappropriate and disrespectful language to Plaintiff Mrs. Heilbronn when he was caught.  However, because he was a male employee, Defendant Sulema intervened and would not let the Plaintiffs terminate him.  When the Plaintiffs complained to Defendant Sulema that they felt completely unsupported by him despite their years of service to the Company, Defendant Sulema responded, in substance and in part, that they should get over it and move on. Then in a move intended to embarrass the Plaintiffs, Defendant Sulema promoted this male employee a few months later.

67.     ITN also has a history of terminating or forcing out older female employees or female employees who reached senior positions in the Company.  Prior to the Plaintiffs, the last female to reach the title of EVP in the Buying Department was terminated in or about 2012.  At around the same time, ITN terminated a female EVP in the Planning Department.  Once the female EVPs from the Buying and Planning Departments were removed from their positions, Defendant Sulema took over supervision of both the Buying and Planning Departments.

68.     ITN also fired a female SVP in the Digital Department and Defendant Sulema took over supervision of that department as well.

69.     In a similar fashion, ITN forced out a former female EVP of Sales to make room for a male successor.  Likewise, ITN also forced out of the Sales Department its most senior female account executive who was over the age of 50.

70.     ITN's female comptroller was forced out of the Company after she was passed over for promotion to SVP in favor of a male employee.

71.     When the ProVantageX Department was downsized, Defendant Sulema retained the department's two male EVPs, but fired its one female EVP.  In addition, ITN grouped all females over the age of 50 years old into a single group in the ProVantageX Department, and then proceeded to fire all of them.

72.     ITN's Cable Operations Department is composed of all male employees. Defendant Sulema stated to Plaintiffs, and other female employees, on multiple occasions, that he "can't put women into the Cable Department" because they never last.  Rather than taking action to change the toxic culture of the Cable Operations Department, Defendant Sulema instead just refuses to hire female employees to work in that department.

73.     In or about October 2021, ITN's CFO told a junior female employee that for the benefit of her career, she should consider leaving ITN since the Company does not offer much room for advancement for female employees in the Buying Department.

**C.     Plaintiffs Mrs. Resnik and Mrs. Heilbronn are Promoted to Executive Vice Presidents but Defendant Sulema Cuts their Total Compensation**

74.     Despite the challenges posed by the male-dominated ITN work environment, Plaintiffs continued to excel at their jobs and the Buying Department under their management continued to produce great results for the Company.

75.     In or about January 2020, Plaintiffs Mrs. Resnik and Mrs. Heilbronn were promoted to EVPs in the Buying Department.   The promotions were universally well received in the

21

Company.  A former President of Sales at ITN sent Plaintiffs Mrs. Resnik and Mrs. Heilbronn the following message upon hearing of their promotions: "Cannot think of 2 people in the whole company who deserve it more – you both save them a ton of money every year while having forged tremendous station relationships."  Even Defendant Sulema sent a Company-wide email praising Plaintiffs Mrs. Resnik and Mrs. Heilbronn for the quality of their work, their industry knowledge and professional expertise.

76.     Plaintiffs Mrs. Resnik and Mrs. Heilbronn were given modest salary increases along with their promotions to EVPs, however even with these raises they were still paid considerably less than all of the male EVPs and most of the male SVPs in the Company.

77.     Following her promotion to EVP, in early 2020, Plaintiff Mrs. Resnik was allowed to attend the senior management meetings that she had previously been excluded from.  However, two months later, when the COVID-19 pandemic began, both Plaintiffs Mrs. Resnik and Mrs. Heilbronn were again excluded from the senior management meetings which returned to being attended by only male department managers.

78.     With the onset of the COVID-19 pandemic, Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer worked long hours to transition the Buying Department to remote work and to maintain their relationships with the employees in the Buying Department, their television station partners and the stations' sales representatives.

79.     The Plaintiffs hard work successfully managing the Buying Department through the challenges of the pandemic in 2020 led the Company CEO to comment that promoting Plaintiffs Mrs. Resnik and Mrs. Heilbronn was "the best decision".

80.     However, Defendant Sulema continually cut Plaintiffs' bonuses so that by the end of 2020, Plaintiffs Mrs. Resnik and Mrs. Heilbronn, despite their stellar work performance were actually earning less as EVPs in 2020 than when they were making as SVPs in 2018.

81.     At the end of 2020, Defendants Mrs. Resnik and Mrs. Heilbronn had a meeting with Defendant Sulema in which they asked why they were both compensated less as EVPs than when they were as SVPs, especially in light of their recent successes in managing the Buying Department and its 50 employees through COVID-19, the long hours they worked, and the money that their efforts, and the efforts of the Buying Department as a whole, saved the company.

82.     During the same conversation, Plaintiffs Mrs. Resnik and Mrs. Heilbronn also informed Defendant Sulema that they were aware that three recently departed male VPs had been paid more than them.  Plaintiffs Mrs. Resnik and Mrs. Heilbronn pointed out that one of the recently departed male VPs was making a base salary substantially higher than Plaintiffs total compensation.  These male VPs had nowhere near the supervisory responsibilities that Plaintiffs had, the male VPs did not run departments, the males worked fewer hours, and the male VPs had no direct role in generating profit of the Company.

83.     Defendant Sulema admitted that the male VPs were getting paid more and justified this disparity by telling Plaintiffs Mrs. Resnik and Mrs. Heilbronn that they both needed to "grow into their position."   Plaintiffs Mrs. Resnik and Mrs. Heilbronn had been with ITN for approximately 25 years each at this point; the departed male VPs who were earning more than them as VPs, had lasted at the company approximately 2-3 years each.

84.     In late 2021, Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer took ITN's harassment and discrimination training module.  The computer-based training had a section related to gender discrimination and the legal requirement that women and men must be paid equally for

equal work under similar working conditions.  The module discussed Federal, State and Local laws that required fair and equal pay between male and female employees.  At the end of the training module, on a slide entitled "Your Rights," female employees who feared that they were encountering discriminatory pay practices in the workplace, were advised to "Raise Concerns" and "Request Salary Info & Accommodations."

### D. Plaintiff Ammer is Promoted to Executive Vice President but Defendant Sulema Holds Down Her Compensation

85.     In January 2022, Plaintiff Mrs. Ammer was promoted to EVP- Dashboard Director in the Buying Department.  Upon the announcement of her promotion, ITN's CEO congratulated her in an email stating that this was a "well deserved promotion" and that he "admire[d] [her] perseverance."   Similarly, Defendant Sulema wrote that he "appreciate[d] all you do" for ITN and that Plaintiff Mrs. Ammer deserved this promotion "on many levels."   Defendant Sulema added that he appreciated Plaintiff Mrs. Ammer's "positive attitude" and her "long term view" of her role at the Company.   However, despite this praise, Defendant Sulema did not give Plaintiff Mrs. Ammer any meaningful pay increase to accompany her promotion and increased work responsibilities.  In fact, as he did with Plaintiffs Mrs. Resnik and Mrs. Heilbronn, Defendant Sulema worked to reduce her total compensation.

86.     Based in part on what she had learned from the training module on gender discrimination, Plaintiff Mrs. Ammer requested and had a conversation with Defendant Sulema to discuss why she was now making less money as an EVP than she had when she was an SVP. During this conversation and follow up exchanges, Plaintiff Mrs. Ammer pointed out that she was compensated less than male EVPs who had similar job responsibilities at ITN.  She also pointed out that some of her subordinates had received larger pay increases that year than she did despite

her being promoted to EVP.  Plaintiff Mrs. Ammer asked Defendant Sulema to reevaluate her compensation.  Defendant Sulema refused to do so.

### E.    Plaintiffs Raise their Gender Bias Concerns with Senior ITN Management

87.    On or about January 24, 2022, based in part on the information they had learned from the gender-bias training module, Plaintiffs Mrs. Resnik and Mrs. Heilbronn requested and had a meeting with Defendant Sulema to discuss why their compensation as EVPs continued to lag their male colleagues with EVP or more junior titles who performed equal or lesser roles at the Company.  During the meeting, Plaintiffs Mrs. Resnik and Mrs. Heilbronn stated that while they had been patient to this point, they were not willing to continue to accept being paid less than male EVPs, SVPs and VPs at ITN who performed similar or less important roles.

88.    Plaintiffs Mrs. Resnik and Mrs. Heilbronn explained to Defendant Sulema that the training module they had recently taken specifically stated that the law requires "equal pay for equal work" among male and female employees with similar work responsibilities.  Plaintiffs Mrs. Resnik and Mrs. Heilbronn asked, pursuant to the training module's enumeration of female employees' rights, that Defendant Sulema conduct a compensation review to determine if they were being paid fairly as female EVPs at ITN under the Equal Pay Act.  Plaintiffs added that they hoped that Defendant Sulema would support them in this effort to equalize their pay with the male EVPs at ITN.

89.    Defendant Sulema responded that he knew nothing about the training that Plaintiffs Mrs. Resnik and Mrs. Heilbronn were referring to and that he was unaware of the requirements of the Equal Pay Act.  Defendant Sulema proceeded to admit that Plaintiffs Mrs. Resnik and Mrs. Heilbronn were paid less than each of ITN's male EVPs.  Defendant Sulema then declared that the Company's CEO and CFO had "never told me that I had to pay women and men equally for equal

work."  Defendant Sulema then expressed great interest in how the Plaintiffs had discovered that they were being paid less than each of the male EVPs and SVPs.  Defendant Sulema stated that he hoped he had not accidentally sent the Plaintiffs an email that he "wasn't supposed to send."

90.     Defendant Sulema during this conversation further admitted that when he held the title of EVP of the Buying Department in 2019, his compensation was substantially higher than Plaintiffs Mrs. Resnik's and Mrs. Heilbronn's current compensation.  At the conclusion of the conversation, Defendant Sulema stated that he did not want to continue the conversation and wanted to consult with ITN's CFO.

91.     The following day, on or about January 25, 2022, Plaintiffs Mrs. Resnik and Mrs. Heilbronn had a follow up call with Defendant Sulema. During that conversation, Defendant Sulema stated that he had spoken to ITN's male CFO and that the CFO "was also unaware of the online discrimination training" that the Plaintiffs had referenced and that the CFO "did not even have access to it," and therefore the training module "could not be reviewed."

92.     Defendant Sulema also reported that the CFO had told him that the Company was not going to share any compensation information with the Plaintiffs because "we don't have to." Defendant Sulema refused the Plaintiffs' request to conduct a compensation review but continued to ask again how Plaintiffs Mrs. Resnik and Mrs. Heilbronn discovered that they were being paid less than their male peers.  At the conclusion of the meeting, Plaintiffs Mrs. Resnik and Mrs. Heilbronn asked to speak with ITN's CEO about their pay-inequality concerns.

93.     On or about January 26, 2022, Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer requested a meeting with ITN's male CEO.  The CEO agreed to speak only with Plaintiffs Mrs. Resnik and Mrs. Heilbronn, stating that he would meet with Plaintiff Mrs. Ammer separately at a later date.

94.     On or about January 26, 2022, Plaintiffs Mrs. Resnik and Mrs. Heilbronn met with ITN's CEO and CFO.  Addressing ITN's CEO, Plaintiff Mrs. Heilbronn stated that the Plaintiffs were the only three female EVPs at ITN and that they were being paid substantially less than all of male EVPs at ITN and in some cases less than male SVPs and VPs despite the fact that the female EVPs perform equal or more important work at the Company.

95.     Plaintiff Mrs. Heilbronn continued, that all that the Plaintiffs were seeking was equal pay for equal work, but that the Plaintiffs' concerns had been repeatedly dismissed by Defendant Sulema.  Plaintiff Mrs. Heilbronn also informed the CEO that both Defendant Sulema and the male CFO had acknowledged that the Plaintiffs are paid less than their male counterparts, but Defendant Sulema and the male CFO's only concern seemed to be how the Plaintiffs discovered this information.

96.     ITN's CEO responded by telling Plaintiffs Mrs. Resnik and Mrs. Heilbronn how valuable they were to the Company and how he considered them "his people."  The CEO acknowledged that the Plaintiffs were paid less than their male counterparts, but claimed that there was little he could do because the Board of Directors was focused on keeping salaries down.

97.     The CEO and CFO then questioned Plaintiffs on how they discovered the gender-based pay disparity.  The CFO again asked the Plaintiffs if there had been a data breach or if some "rabble rouser" had shared this information with them.  The CFO also asked if perhaps he or the human resources manager had accidentally sent them an email with the information that the Plaintiffs should not have received.  Despite the CEO's and CFO's focus on how the Plaintiffs discovered the gender-based pay imbalance at the Company, they expressed no concern about equalizing the Plaintiffs' compensation to those of their male peers at the Company.  The CFO stated only that he would look into increasing the Plaintiffs' base salaries, but that Plaintiffs

"should not expect much." The CFO added that any increase would have to be modest to avoid detection by the Board of Directors.

98.     On or about February 2, 2022, Plaintiff Mrs. Ammer met with ITN's CEO and CFO. Plaintiff Mrs. Ammer expressed that while she was excited about her promotion to EVP, she was disappointed about the lack of an accompanying meaningful salary increase. Plaintiff Mrs. Ammer stated that she believed that there was a dramatic pay disparity between male and female EVPs at ITN, and that she wanted to be paid fairly for performing equal work to her male colleagues.

99.     ITN's CEO and CFO expressed very little concern in response to Plaintiff Mrs. Ammer's statements about pay inequality at ITN. Rather, they were concerned only with how Plaintiff Mrs. Ammer had found out that the male EVPs at ITN received higher compensation than each of the Plaintiffs. The CFO again asked if there had been a data breach or whether a disgruntled ex-employee from the downsized ProVantageX Department released compensation information. The CFO said that if an employee had released such information, ITN would consider pursuing legal action against them. The CFO further told Plaintiff Mrs. Ammer that he would look into her salary concern, but that she "should not expect much." The CFO added that Defendant Sulema would contact her about this in about a week. Defendant Sulema never contacted Plaintiff Mrs. Ammer.

**F.     Plaintiffs Refuse Defendants' Offer of Hush Money to Drop their Complaints About Gender Discrimination at the Company**

100.     On or about February 3, 2022, Defendant Sulema offered Plaintiffs Mrs. Resnik and Mrs. Heilbronn "hush money" in the form of a raise of $20,000 per year, prorated as of April 1, 2022 (so the actual raise would be $15,000 for 2022), contingent on the Company having a successful first quarter of 2022, in exchange for the Plaintiffs dropping their complaints about

gender inequality.  Defendant Sulema stated, however, that if ITN did not perform well in the first quarter of 2022, then the Company would have to reassess the increase or potentially terminate employees in the Buying Department to offset Plaintiffs' raises.  This proposed compensation increase would still not bring Plaintiffs even close to parity with what ITN was paying male EVPs and SVPs who performed similar or lesser work functions at the Company.

101.    Plaintiffs Mrs. Resnik and Mrs. Heilbronn responded that being given a pay increase contingent on Company performance was not the point of their prior conversations with ITN's senior management.  The raises given to male EVPs and SVPs at the Company were not made contingent on future Company performance, and the male EVPs and SVPs were not threatened with the termination of their employees to offset their raises.  Accordingly, Plaintiffs, as female EVPs, should not be subject to such conditions either.  Rather, Plaintiffs wanted to end gender pay discrimination at ITN and have their compensation equalized to that of their male peers who performed similar work.  Defendant Sulema nonetheless told Plaintiffs to think over the offer.

102.    The following day, on or about February 4, 2022, Defendant Sulema emailed Plaintiffs Mrs. Resnik and Mrs. Heilbronn and stated, in substance and in part, that he was going to also give raises – contingent on Company first quarter performance -- to Plaintiff Mrs. Ammer and another female employee in the Buying Department, but before he would do so, he needed to know if Plaintiffs Mrs. Resnik and Mrs. Heilbronn were going to accept his offer from the day before.

103.    On or about February 7, 2022, Plaintiff Mrs. Resnik responded to Defendant Sulema via email and stated, "[a]fter discussing this email below [with Plaintiff Mrs. Heilbronn], we do not see what our issue has to do with pay raises based on the company's quarterly performance. The issue we have been discussing with you, Todd [the CEO] and Steven [the CFO]

29

is about gender pay inequality at our level. Accordingly, we do not see why communication to others about raises based on company performance should be held up. We will reach out to you to continue the discussion regarding our issue shortly."

104.    On or about February 8, 2022, Defendant Sulema and ITN's CFO met with Plaintiffs Mrs. Resnik and Mrs. Heilbronn to discuss whether Plaintiffs would accept ITN's offer of hush money in exchange for dropping complaints about gender-based pay inequality at ITN. Plaintiff Mrs. Resnik responded on behalf of herself and Plaintiff Mrs. Heilbronn by stating: "Thanks for the proposed offer but here is the question we have with it. We are looking for a pathway for equality and this number does not get us there. Frankly, it does not even get us very close. If this is a first step towards equalizing our compensation, we are willing to listen to you, work with you, and be patient to an extent but we need a concrete proposal. This offer on its own doesn't do that."

105.    Defendant Sulema and the CFO responded with hostility to Plaintiff Mrs. Resnik's rejection of ITN's offer of hush money.  The CFO stated that the Plaintiffs were paid less as female EVPs than the male EVPs at ITN because he and Defendant Sulema valued the female-managed Buying Department "differently" than the male-managed departments.   Plaintiff Mrs. Resnik challenged this statement by asking: "You are saying we are not as valuable as other male EVPs in this company because we are in the Buying Department?"   The CFO responded: "That is correct."

106.    Plaintiff Mrs. Resnik then asked the CFO and Defendant Sulema if ITN's Board of Directors was aware that all of ITN's male EVPs received higher compensation than each of the female EVPs at the Company.  The CFO responded that "Yes, the Board knows and approves." The CFO then gratuitously added that if the Plaintiffs were not content with their situation, it did

not matter because the Board "will not meet with you."   The CFO continued that the Board would not have time to hear the Plaintiffs' complaints because, despite the Plaintiffs being the highest ranking female officers in the Company, they were, in his opinion, and in the eyes of the all-male Board, "just employees."

### G.    Plaintiffs Ask to Meet with ITN's Board of Directors but are Rebuffed

107.    On or about February 14, 2022, Plaintiffs Mrs. Resnik, Mrs. Heilbronn and Mrs. Ammer wrote a letter to a member of the ITN Board of Directors ("Board Member") in which they explained their concern about gender pay inequity at ITN and requested a meeting with a representative of the Board of Directors.

108.    In the Board Letter, the Plaintiffs explained how Defendant Sulema and the CFO had acknowledged that ITN pays its female EVPs less than its male EVPs and that Defendant Sulema had stated that he was not even aware that he had to pay male and female employees equally for equal work.  The Plaintiffs also expressed dismay "that the CFO of a Media **Buying** Company would tell the EVPs of the **Buying** Department that [their] work and the work of the dedicated employees in [their] group are the least important part of the company."  (Emphasis in original).  The Plaintiffs expressed their continuing desire to "work within the company to correct this gender-based pay inequality issue," but were growing disheartened that their continued "attempts to seek redress have been met with hostility and disrespect."  The Plaintiffs closed by "appealing to [the Board] for help" and asking to meet with a representative of the Board "to discuss this matter in more detail."

109.    On or about February 17, 2022, the Board Member emailed the Plaintiffs and indicated that the ITN Board of Directors would not meet with the Plaintiffs.  Rather, the Board

Member said that the ITN Board was referring the matter back to the Company to "look into your concerns."

110.    On or about March 10, 2022, the CFO contacted the Plaintiffs to tell them that ITN had retained counsel and that the Plaintiffs should expect to be contacted shortly.

111.    On or about March 15, 2022, an attorney from the Littler Mendelson PC law firm ("Littler attorney") reached out to each of the Plaintiffs to request an interview.  Shortly thereafter, Plaintiffs agreed to be interviewed and requested that they be permitted to be represented by counsel at the interviews.  The Littler attorney refused to permit Plaintiffs to be represented at the interview.  When the Plaintiffs insisted on being represented, the Littler attorney refused to conduct the interviews.

### H.    Defendant Sulema and ITN Retaliate Against Plaintiffs for Asking for Equal Pay

112.    While ITN took no meaningful steps to address Plaintiffs' concerns about gender-based pay discrimination, the Company did scramble to conduct damage control in response to the issues raised by Plaintiffs.  Shortly after the Plaintiffs raised their gender bias concerns, ITN instituted pay increases for many of the female employees in the Buying Department whose salaries lagged behind male employees of equal or lesser rank at the Company.

113.    ITN management, including Defendant Sulema, adopted the ruse of claiming the raises were based on better than expected first quarter earnings, rather than admitting it was to ameliorate the gender-based disparity identified by the Plaintiffs.  Belying the claim of first quarter success, was the fact that the first quarter had not even ended at the time of the announcement of the raises.  Further, the Company had never before announced raises based on a strong quarter's performance.  The April 2022 pay increase was an institutional admission of the gender pay bias

which was entrenched at ITN.  Even so, these raises did not bring ITN's female employees up to parity with their male peers at the Company.

114.    Further, the Plaintiffs' complaints about discrimination also caused the Company to hastily attempt to address its abysmal diversity record, suddenly offering overdue raises and promotions to its very small number of employees of color.  In addition, the Company announced it would participate in a minority hiring program.

115.    With regards to the Plaintiffs, however, the Company responded only with hostility and retaliation.  The retaliation effort began almost immediately after Plaintiffs raised their pay-inequity concerns with Defendant Sulema in late January 2022. Defendant Sulema, with the approval of others in ITN's upper management, embarked on a campaign of barraging Plaintiffs with assignments that had no legitimate business purpose and that the Plaintiffs were never previously required to undertake.  Defendant Sulema made no use of the information he required the Plaintiffs to collect as part of these assignments, as the assignments were designed solely to harass and intimidate Plaintiffs.

116.    For example, on or about January 27, 2022 – two days after Plaintiffs expressed their pay inequality concerns to Defendant Sulema – Defendant Sulema notified the Plaintiffs Mrs. Resnik and Mrs. Heilbronn in a 7:17am email that he was now going to require them to prepare written status reports for him on a weekly basis.  Upon the submission of each report, Defendant Sulema would respond with excessive criticism or nonsensical follow up tasks.  The status reports were not needed or used to further any legitimate work purpose.

117.    At around the same time, Defendant Sulema stopped meeting alone with Plaintiffs to conduct Company business.  Instead, Defendant Sulema began meeting with Plaintiff's subordinates to address Buying Department business.  Further, Defendant Sulema reduced almost

all communication with Plaintiffs to email.  These retaliatory and unprofessional actions made it more difficult for Plaintiffs to perform their jobs and undermined their authority within the Buying Department.

118.    Defendant Sulema worked to undermine Plaintiffs stature with their television station partners by taking over communications with the television stations on ITN-related issues that were traditionally handled by Plaintiffs.  For example, on January 28, 2022, Defendant Sulema, without notice to Plaintiffs Mrs. Resnik and Mrs. Heilbronn, sent emails to television station groups providing them with updates on ITN operations, a communication typically handled by Plaintiffs.  On May 26, 2022, Defendant Sulema sent an email to television stations groups about upgrades and enhancements that had been made to the ITN Portal platform.  However, despite Plaintiff Mrs. Ammer being in charge of the ITN Portal, Defendant Sulema purposefully left her off of the email.  In both instances, not only were Plaintiffs not informed that Defendant Sulema was going to send these communications, but they were not consulted about the contents of the communications; thus complicating their ability to respond to questions that they were certain to receive about the communications from their television station partners.

119.    At around this same time, Defendant Sulema began to require Plaintiffs to hold group and department meetings each day that they were in the office.  Previously, Plaintiffs had the discretion to decide when a buying group or Buying Department meeting was needed.  Holding so many meetings had no business purpose and eroded the morale of the employees in the Buying Department.  In addition, Defendant Sulema required that the Plaintiffs provide him with a meeting agenda in advance of each meeting.  He also required that the Plaintiffs draft a report after each meeting.  None of these tasks had ever been required of Plaintiffs before and pre-clearing agendas

34

and drafting meeting reports served no business function.  Defendant Sulema instituted these tasks solely to harass and retaliate against Plaintiffs.

120.    While Defendant Sulema also worked to undermine the Plaintiffs' leadership in the Buying Department by holding meetings with the Plaintiffs' subordinates and inviting the subordinates to revisit issues already decided by the Plaintiffs.

121.     During this period, Defendant Sulema required Plaintiffs to conduct a review of the buying process despite the fact that the procedures in place were running smoothly and effectively.  Plaintiffs nonetheless prepared a report containing thirteen suggestions for improving the buying process and enhancing communications with the Planning Department.  Defendant Sulema criticized without basis each suggestion.

122.    In response, Plaintiff Mrs. Resnik proposed discussing the suggestions at an upcoming Buying Department meeting since the suggestions were a collaborative effort from the Department and the Department's employees felt the suggestions were valid and had merit.  At the Buying Department meeting, Defendant Sulema dismissed without basis every idea that the Plaintiffs and employees of the Buying Department put forward.

123.    About a week after the meeting, Defendant Sulema asked for more "big picture" suggestions.  Plaintiffs provided five more suggestions.  Defendant Sulema again critiqued the suggestions without meaningful basis and instructed Plaintiffs to again provide more "thoughts and ideas."  Plaintiffs Mrs. Resnik and Mrs. Heilbronn responded that they had already provided 18 suggestions and that the consensus in the Buying Department was that everyone was happy with those ideas and the existing buying processes.

124.    Defendant Sulema then told Plaintiffs Mrs. Resnik and Mrs. Heilbronn, in an effort to undermine them, that he was going to discuss the issue with the Plaintiffs' subordinate VPs and

D399880/FL3345

then "fill them in" on what their subordinates had to say.  When Plaintiffs informed Defendant

Sulema that their VPs had fully participated in developing the suggested improvements and liked

the processes that had been designed, Defendant Sulema responded with derision and more

baseless criticism.  Defendant Sulema never "filled in" the Plaintiffs about what was discussed at

his meeting with their subordinate VPs and Plaintiffs never heard anything more about proposed

improvements to the buying process.

125.    Defendant Sulema had no intention of meaningfully discussing improvements to

the buying process, a process which was already running smoothly and effectively.  The task

Defendant Sulema had given the Plaintiffs was intended only to harass and retaliate against them

from raising gender-based pay equity concerns.

126.    Defendant Sulema next worked to undermine Plaintiffs Mrs. Resnik's and Mrs.

Heilbronn's authority overseeing the Junior Media Buyer training program which prepares

qualified Assistant Media Buyers for the position of Junior Media Buyer in the Buying

Department.  Plaintiffs Mrs. Resnik and Mrs. Heilbronn traditionally determined when a training

program should be instituted depending on the needs of the Buying Department and whether any

of the Assistant Media Buyers were sufficiently experienced to begin learning basic buying skills.

127.    On or about March 2, 2022, Defendant Sulema questioned the Plaintiffs on why

there was no training program currently running.  Plaintiffs responded that there was no need as

the Buying Department was fully staffed and two of the current Buyers did not yet have a full list

of markets (meaning they had capacity to take on more work).  In addition, there was only one

Assistant Media Buyer who had developed sufficient skills and he was being trained by his Buyer

outside the official program.  Defendant Sulema responded by claiming that another Buyer had

told him that her Assistant Media Buyer was ready for the program and therefore, the Plaintiffs needed to run a training program.

128.    This claim by Defendant Sulema was revealed as false.  Undeterred, Defendant Sulema eventually just ordered the Plaintiffs to initiate a new training cycle even though one was not needed.  Defendant Sulema took this step solely to increase the workload on Plaintiffs in retaliation for them raising pay-equity concerns.

129.    From late January 2022 to June 2022, Defendant Sulema remained relentless in inventing additional work tasks for Plaintiffs and leveling baseless criticism.  For example, he assigned Plaintiffs data analytics projects, despite ITN having a data analytics department. Defendant Sulema leveled blame on Plaintiffs when client advertising spots were preempted for political commercials, an occurrence that happened regularly during election cycles and over which Plaintiffs had no control.  Defendant Sulema criticized Plaintiffs for television stations removing inventory from the ITN Portal, despite Plaintiffs having absolutely no control over such decisions.  Defendant Sulema also criticized Plaintiffs for not communicating these inventory changes to the Planning Department in the days prior to the Buying Department's deadline for finalizing its negotiations with the television stations.  Such information, however, was never communicated to the Planning Department prior to the negotiation deadline since to do so would be meaningless as station inventory was constantly fluctuating up until the final deadline.  Despite Defendant Sulema's baseless and abusive criticism, Plaintiffs and the Buying Department timely completed, as they always did, all of the necessary negotiations prior to the deadline.  Once this was done, the Planning Department had timely access to any information they required.  Defendant Sulema's criticism was intended only to harass the Plaintiffs and make completion of their work responsibilities more difficult.

D399880/FL3345

130.    Defendant Sulema required from Plaintiffs a myriad of reports about the ITN Portal, the auto-buying process, TV commercial deliveries, TV commercial preemptions, political races, and station dashboard activity that had never before been required and which served no discernable business function.   Defendant Sulema never made use of any of the reports that he required Plaintiffs to submit to him.

131.    During this time period, Defendant Sulema also created needless confrontation with the Plaintiffs over routine matters in an effort to undermine their authority and manufacture criticism of their management of the Buying Department.

132.    For example, in May 2022, during a routine staffing discussion, Defendant Sulema asked whether a junior media buyer wanted to keep a male intern, who was currently assigned to her desk, working as her assistant.   Plaintiffs Mrs. Resnik and Mrs. Heilbronn responded that the junior media buyer had told them that she did not want the intern to remain on her desk since he was performing poorly.   Based on this feedback, Plaintiffs suggested finding the intern a role in another department where he would hopefully be more successful, since this was the fourth employee in the Buying Department to complain about the male intern's poor performance.

133.    This poorly-performing intern, however, was a family friend of Defendant Sulema and Defendant Sulema seized upon this criticism of his family friend's performance to launch into an email tirade lasting two days in which he searched in vain for some way to blame this intern's performance issues on Plaintiffs or on the intern's female supervisors.

134.    When Plaintiffs responded point-for-point to the baseless criticism, demonstrating that the intern had been treated fairly, given multiple opportunities to succeed, received retraining and ample notice of his underperformance, Defendant Sulema would not relent in his email barrage and continued to blame the intern's failures on his female supervisors.   Ultimately, Defendant

Sulema, as part of his pattern and practice of trying to undermine the Plaintiffs, stated he wanted to discuss the issue with Plaintiffs' subordinates to get their opinions.

135.     This toxic email exchange took up hours of Plaintiffs' work time over two days that could have been spent addressing actual department priorities.  Plaintiff Sulema's conduct was intentionally abusive and designed to retaliate against Plaintiffs for their gender-based discrimination complaints.  Defendant Sulema's conduct was consistent with his practice of defending any male employee, no matter how junior their position at the Company, from criticism by female supervisors.

136.     However, the most disturbing act of retaliation carried out by Defendant Sulema involved his intentional violation of ITN's COVID-19 policy.  As part of its return to work plan, ITN instituted a vaccine policy that provided that non-vaccinated employees had to work remotely and could not enter the Company's physical offices located at 747 Third Avenue in New York City.

137.     Plaintiffs had numerous conversations with Defendant Sulema about the enforcement of ITN's COVID policy as many of the Buying Department's employees had expressed concerns about returning to the workplace during the pandemic.  In addition, many Buying Department employees had heightened COVID safety concerns because they either took care of elderly relatives or infirm family members, or had young unvaccinated children at home.

138.     With knowledge of Company policy and the health concerns of Buying Department employees, Defendant Sulema reached out to an Assistant Media Buyer in the Buying Department who he knew to be unvaccinated.  Defendant Sulema invited the unvaccinated employee to come to work at the ITN offices on the Buying Department's floor.  Defendant Sulema did not inform Plaintiffs that he had instructed a non-vaccinated employee to come to work in their office space.

After approximately two weeks of working in the ITN offices, the unvaccinated and unmasked employee told some of her co-workers in the Buying Department that she was unvaccinated and that Defendant Sulema was aware of her unvaccinated status.  This unvaccinated employee told others in the Buying Department that Defendant Sulema had invited her to come to work in the office.  This revelation caused widespread concern and outrage amongst the employees of the Buying Department.

139.    When Plaintiff Mrs. Resnik was informed by employees in the Buying Department of the unvaccinated employee's statements, Plaintiff Mrs. Resnik contacted ITN's human resources manager.  The human resources manager connected Plaintiff Mrs. Resnik with the CFO. During a telephone call, the CFO would provide no explanation as to why Plaintiffs were not informed of the presence of an unvaccinated employee in their Department. Rather, the CFO stated that the unvaccinated employee had received either a medical or religious exemption from Defendant Sulema.  On information and belief, that statement is untrue.  Rather, Defendant Sulema covertly allowed an unvaccinated employee into the Buying Department in a disturbing act of retaliation against the Plaintiffs.

### AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF OF RESNIK
### (Violation of 29 U.S.C.A. § 206(d)(1) - The Equal Pay Act as Against ITN)

140.    Plaintiffs repeat, reallege, and reiterate the allegations in paragraphs 1 through 139 as if more fully set forth herein.

141.    Under the Equal Pay Act, the Defendant is required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

142.    Resnik has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

143.    Resnik's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

144.    The conditions under which Resnik and her male counterparts performed their jobs were basically the same.

145.    Resnik's male counterpart EVPs were paid more under these circumstances in violation of the Equal Pay Act.

146.    In addition, Resnik was paid less than subordinate male SVPs and VPs despite having more responsibilities.

147.    As a result of the foregoing, Resnik has suffered damages for the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.

148.    Defendants have willfully violated Resnik's rights under the Equal Pay Act and she is entitled to liquidated damages.

### AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF OF HEILBRONN
### (Violation of 29 U.S.C.A. § 206(d)(1) - The Equal Pay Act as Against ITN)

149.    Plaintiffs repeat, reallege and reiterate the allegations in paragraphs 1 through 148 as if more fully set forth herein.

150.    Under the Equal Pay Act, the Defendant is required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

151.    Heilbronn has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

152.    Heilbronn's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

153.    The conditions under which Heilbronn and her male counterparts performed their jobs were basically the same.

154.    Heilbronn's male counterpart EVPs were paid more under these circumstances in violation of the Equal Pay Act.

155.    In addition, Heilbronn was paid less than subordinate male SVPs and VPs despite having more responsibilities.

156.    As a result of the foregoing, Heilbronn has suffered damages for the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.

157.    Defendants have willfully violated Heilbronn's rights under the Equal Pay Act and she is entitled to liquidated damages.

### AS AND FOR A THIRD CAUSE OF ACTION ON BEHALF OF AMMER
### (Violation of 29 U.S.C.A. § 206(d)(1) - The Equal Pay Act as Against ITN)

158.    Plaintiffs repeat, reallege and reiterate the allegations in paragraphs 1 through 157 as if more fully set forth herein.

159.    Under the Equal Pay Act, the Defendant is required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

160.    Ammer has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

161.    Ammer's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

162.    The conditions under which Ammer and her male counterparts performed their jobs were basically the same.

163.    Ammer's male counterpart EVPs were paid more under these circumstances in violation of the Equal Pay Act.

164.    In addition, Ammer was paid less than subordinate male SVPs and VPs despite having more responsibilities.

165.    As a result of the foregoing, Ammer has suffered damages for the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.

166.    Defendants have willfully violated Ammer's rights under the Equal Pay Act and she is entitled to liquidated damages.

### AS AND FOR A FOURTH CAUSE OF ACTION ON BEHALF OF RESNIK
### (Violation of N.Y. Labor Law § 194(1)(4)(a) as against ITN)

167.    Resnik repeats, realleges and reiterates the allegations in paragraphs 1 through 166 as if more fully set forth herein.

168.    Under Labor Law § 194(1)(4)(a), the Defendants are required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

169.    Resnik has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

170.    Resnik's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

171.    The conditions under which Resnik and her male counterparts performed their jobs were basically the same.

172.    Resnik's male counterpart EVPs were paid more under these circumstances in violation of the New York Labor Law.

173.    In addition, Resnik was paid less than subordinate male SVPs and VPs despite having more responsibilities.

174.    As a result of the foregoing, Resnik has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.  In addition, Resnik is entitled pre-judgment interest and an award of attorneys' fees.

175.    Defendants have willfully violated Resnik's rights under the New York Labor Law and she is entitled to liquidated damages.

### AS AND FOR A FIFTH CAUSE OF ACTION ON BEHALF OF HEILBRONN
### (Violation of N.Y. Labor Law § 194(1)(4)(a) as against ITN)

176.    Heilbronn repeats, realleges and reiterates the allegations in paragraphs 1 through 175 as if more fully set forth herein.

177.    Under Labor Law § 194(1)(4)(a), the Defendants are required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

178.    Heilbronn has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

179.    Heilbronn's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

180.    The conditions under which Heilbronn and her male counterparts performed their jobs were basically the same.

181.    Heilbronn's male counterpart EVPs were paid more under these circumstances in violation of the New York Labor Law.

182.     In addition, Heilbronn was paid less than subordinate male SVPs and VPs despite having more responsibilities.

183.     As a result of the foregoing, Heilbronn has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.  In addition, Heilbronn is entitled pre-judgment interest and an award of attorneys' fees.

184.     Defendants have willfully violated Heilbronn's rights under the New York Labor Law and she is entitled to liquidated damages.

### AS AND FOR A SIXTH CAUSE OF ACTION ON BEHALF OF AMMER
### (Violation of N.Y. Labor Law § 194(1)(4)(a) as against ITN)

185.     Ammer repeats, realleges and reiterates the allegations in paragraphs 1 through 184 as if more fully set forth herein.

186.     Under Labor Law § 194(1)(4)(a), the Defendants are required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

187.     Ammer has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

188.     Ammer's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

189.     The conditions under which Ammer and her male counterparts performed their jobs were basically the same.

190.     Ammer's male counterpart EVPs were paid more under these circumstances in violation of the New York Labor Law.

191.   In addition, Ammer was paid less than subordinate male SVPs and VPs despite having more responsibilities.

192.   As a result of the foregoing, Ammer has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.  In addition, Ammer is entitled pre-judgment interest and an award of attorneys' fees.

193.   Defendants have willfully violated Ammer's rights under the New York Labor Law and she is entitled to liquidated damages.

### AS AND FOR A SEVENTH CAUSE OF ACTION ON BEHALF OF RESNIK
### (Violation of the New York City Administrative Code § 8-107[1](a)(3) as against ITN)

194.   Resnik repeats, realleges and reiterates the allegations in paragraphs 1 through 193 as if more fully set forth herein.

195.   Under New York City Administrative Code § 8-107[1](a)(3) the Defendants are required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

196.   Resnik has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

197.   Resnik's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

198.   The conditions under which Resnik and her male counterparts performed their jobs were basically the same.

199.   Resnik's male counterpart EVPs were paid more under these circumstances in violation of the New York Labor Law.

200.    In addition, Resnik was paid less than subordinate male SVPs and VPs despite having more responsibilities.

201.    As a result of the foregoing, Resnik has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.

### AS AND FOR AN EIGHTH CAUSE OF ACTION ON BEHALF OF HEILBRONN
### (Violation of the New York City Administrative Code § 8-107[1](a)(3) as against ITN)

202.    Heilbronn repeats, realleges and reiterates the allegations in paragraphs 1 through 201 as if more fully set forth herein.

203.    Under New York City Administrative Code § 8-107[1](a)(3) the Defendants are required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

204.    Heilbronn has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

205.    Heilbronn's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

206.    The conditions under which Heilbronn and her male counterparts performed their jobs were basically the same.

207.    Heilbronn's male counterpart EVPs were paid more under these circumstances in violation of the New York Labor Law.

208.    In addition, Heilbronn was paid less than subordinate male SVPs and VPs despite having more responsibilities.

D399880/FL3345

209.    As a result of the foregoing, Heilbronn has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.

### AS AND FOR A NINTH CAUSE OF ACTION ON BEHALF OF AMMER
### (Violation of the New York City Administrative Code § 8-107[1](a)(3) as against ITN)

210.    Ammer repeats, realleges and reiterates the allegations in paragraphs 1 through 209 as if more fully set forth herein.

211.    Under New York City Administrative Code § 8-107[1](a)(3) the Defendants are required to pay female employees the same as male employees who perform substantially similar tasks and who have substantially similar responsibilities.

212.    Ammer has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

213.    Ammer's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

214.    The conditions under which Ammer and her male counterparts performed their jobs were basically the same.

215.    Ammer's male counterpart EVPs were paid more under these circumstances in violation of the New York Labor Law.

216.    In addition, Ammer was paid less than subordinate male SVPs and VPs despite having more responsibilities.

217.    As a result of the foregoing, Ammer has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.

D399880/FL3345

**AS AND FOR A TENTH CAUSE OF ACTION ON BEHALF OF ALL PLAINTIFFS
AGAINST DEFENDANT SULEMA AS AN EMPLOYER
(Violation of the Equal Pay Act)**

218.    The Plaintiffs repeat, reallege and reiterate the allegations in paragraphs 1 through 217 as if more fully set forth herein.

219.    Under the Equal Pay Act and its implementing regulation, 29 U.S.C. § 203(d) Sulema constitutes an employer since he acts directly or indirectly on behalf of ITN.

220.    Accordingly, Sulema is personally liable for the damages caused by the discriminatory conduct to which the Plaintiffs were subjected.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION ON BEHALF OF ALL
PLAINTIFFS AGAINST DEFENDANT SULEMA AS AN EMPLOYER
(Violation of the New York City Administrative Code)**

221.    The Plaintiffs repeat, reallege and reiterate the allegations in paragraphs 1 through 220 as if more fully set forth herein.

222.    Under the New York Administrative Code Sulema constitutes an employer since he acts directly or indirectly on behalf of ITN.

223.    Accordingly, Sulema is personally liable for the damages caused by the discriminatory conduct to which the Plaintiffs were subjected.

**AS AND FOR A TWELFTH CAUSE OF ACTION ON BEHALF OF RESNIK
(Violation of 29 U.S.C.A. § 215(a)(3) – Retaliation Against Sulema and ITN)**

224.    Resnik repeats, realleges and reiterates the allegations in paragraphs 1 through 223 as if more fully set forth herein.

225.    Beginning in January 2022 Resnik engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Resnik's gender.

226.    After Resnik raised a complaint about ITN paying her unequally based upon her gender, Sulema and ITN began to retaliate against Resnik by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

227.    Resnik has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

228.    Defendants have willfully violated Resnik's rights under the EPA and as a result are liable for liquidated damages.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION ON BEHALF OF HEILBRONN
#### (Violation of 29 U.S.C.A. § 215(a)(3) – Retaliation Against Sulema and ITN)

229.    Heilbronn repeats, realleges and reiterates the allegations in paragraphs 1 through 228 as if more fully set forth herein.

230.    Beginning in January 2022, Heilbronn engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Heilbronn's gender.

231.    After Heilbronn raised a complaint about ITN paying her unequally based upon her gender, Sulema and ITN began to retaliate against Heilbronn by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

232.    Heilbronn has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

233.    Defendants have willfully violated Heilbronn's rights under the EPA and as a result are liable for liquidated damages.

D399880/FL3345

## AS AND FOR A FOURTEENTH CAUSE OF ACTION ON BEHALF OF AMMER
### (Violation of 29 U.S.C.A. § 215(a)(3) – Retaliation Against Sulema and ITN)

234.    Ammer repeats, realleges and reiterates the allegations in paragraphs 1 through 233 as if more fully set forth herein.

235.    Beginning in January 2022, Ammer engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Ammer's gender.

236.    After Ammer raised a complaint about ITN paying her unequally based upon her gender, Sulema and ITN began to retaliate against Ammer by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

237.    Ammer has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

238.    Defendants have willfully violated Ammer's rights under the EPA and as a result are liable for liquidated damages.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION ON BEHALF OF RESNIK
### (New York City Administrative Code – Retaliation Against Sulema and ITN)

239.    Resnik repeats, realleges and reiterates the allegations in paragraphs 1 through 238 as if more fully set forth herein.

240.    Beginning in January 2022, Resnik engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Resnik's gender.

241.    After Resnik raised a complaint about ITN paying her unequally based upon her gender, Sulema and ITN began to retaliate against Resnik by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

242.    Resnik has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

D399880/FL3345

243.     Defendants have willfully violated Resnik's rights under the New York City Administrative Code and as a result are liable for liquidated damages.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION ON BEHALF OF HEILBRONN
### (New York City Administrative Code – Retaliation Against Sulema and ITN)

244.     Heilbronn repeats, realleges and reiterates the allegations in paragraphs 1 through 243 as if more fully set forth herein.

245.     Beginning in January 2022, Heilbronn engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Heilbronn's gender.

246.     After Heilbronn raised a complaint about ITN paying her unequally based upon her gender, Sulema and ITN began to retaliate against Heilbronn by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

247.     Heilbronn has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

248.     Defendants have willfully violated Heilbronn's rights under the New York City Administrative Code and as a result are liable for liquidated damages.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION ON BEHALF OF AMMER
### (New York City Administrative Code – Retaliation Against Sulema and ITN)

249.     Ammer repeats, realleges and reiterates the allegations in paragraphs 1 through 248 as if more fully set forth herein.

250.     Beginning in January 2022, Ammer engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Ammer's gender.

251.     After Ammer raised a complaint about ITN paying her unequally based upon her gender, Sulema and ITN began to retaliate against Ammer by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

252.     Ammer has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

253.     Defendants have willfully violated Ammer's rights under the New York City Administrative Code and as a result are liable for liquidated damages.

### AS AND FOR A EIGHTEENTH CAUSE OF ACTION ON BEHALF OF RESNIK
#### (Violation of New York State Human Rights Law § 296)

254.     Resnik repeats, realleges and reiterates the allegations in paragraphs 1 through 253 as if more fully set forth herein.

255.     Under N.Y. Executive Law § 296, it is an unlawful practice for an employer to discriminate against an individual in terms of compensation because of an individual's gender.

256.     Resnik has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

257.     Resnik's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

258.     The conditions under which Resnik and her male counterparts performed their jobs were basically the same.

259.     Resnik's male counterpart EVPs were paid more under these circumstances in violation of the New York State Human Rights Law.

260.     In addition, Resnik was paid less than subordinate male SVPs and VPs despite having more responsibilities.

261.    As a result of the foregoing, Resnik has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.  In addition, Resnik is entitled pre-judgment interest and an award of attorneys' fees.

262.    Defendants have willfully violated Resnik's rights under the New York State Human Rights Law and she is entitled to liquidated damages.

## AS AND FOR A NINETEENTH CAUSE OF ACTION ON BEHALF OF HEILBRONN
### (Violation of New York State Human Rights Law § 296)

263.    Heilbronn repeats, realleges and reiterates the allegations in paragraphs 1 through 262 as if more fully set forth herein.

264.    Under N.Y. Executive Law § 296, it is an unlawful practice for an employer to discriminate against an individual in terms of compensation because of an individual's gender.

265.    Heilbronn has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

266.    Heilbronn's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

267.    The conditions under which Heilbronn and her male counterparts performed their jobs were basically the same.

268.    Heilbronn's male counterpart EVPs were paid more under these circumstances in violation of the New York State Human Rights Law.

269.    In addition, Heilbronn was paid less than subordinate male SVPs and VPs despite having more responsibilities.

270.    As a result of the foregoing, Heilbronn has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an

D399880/FL3345

amount to be determined at trial but not less than $750,000.  In addition, Heilbronn is entitled pre-judgment interest and an award of attorneys' fees.

271.    Defendants have willfully violated Heilbronn's rights under the New York State Human Rights Law and she is entitled to liquidated damages.

### AS AND FOR A TWENTIETH CAUSE OF ACTION ON BEHALF OF AMMER
### (Violation of New York State Human Rights Law § 296)

272.    Ammer repeats, realleges and reiterates the allegations in paragraphs 1 through 271 as if more fully set forth herein.

273.    Under N.Y. Executive Law § 296, it is an unlawful practice for an employer to discriminate against an individual in terms of compensation because of an individual's gender.

274.    Ammer has performed and continues to perform a common core of tasks as an EVP that are substantially equal to or greater than those performed by her male counterparts.

275.    Ammer's job title, job description and responsibilities are equal to those of her male counterparts and in certain circumstances exceed them.

276.    The conditions under which Ammer and her male counterparts performed their jobs were basically the same.

277.    Ammer's male counterpart EVPs were paid more under these circumstances in violation of the New York State Human Rights Law.

278.    In addition, Ammer was paid less than subordinate male SVPs and VPs despite having more responsibilities.

279.    As a result of the foregoing, Ammer has suffered damages because of the Defendants' illegal discriminatory actions, including past and future lost wages and benefits in an amount to be determined at trial but not less than $750,000.  In addition, Ammer is entitled pre-judgment interest and an award of attorneys' fees.

D399880/FL3345

280.     Defendants have willfully violated Ammer's rights under the New York State Human Rights Law and she is entitled to liquidated damages.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION ON BEHALF OF RESNIK
### (Violation of N.Y. Labor Law § 194 as against Sulema and ITN)

281.     Resnik repeats, realleges and reiterates the allegations in paragraphs 1 through 280 as if more fully set forth herein.

282.     Beginning in January 2022, Resnik engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Resnik's gender.

283.     After Resnik raised a complaint about ITN paying her unequally based upon her gender, Sulema and ITN began to retaliate against Resnik by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

284.     Resnik has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

285.     Defendants have willfully violated Resnik's rights under the New York Equal Pay Law and as a result are liable for liquidated damages.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION ON BEHALF OF HEILBRONN
### (Violation of N.Y. Labor Law § 194 as against Sulema and ITN)

286.     Heilbronn repeats, realleges and reiterates the allegations in paragraphs 1 through 285 as if more fully set forth herein.

287.     Beginning in January 2022, Heilbronn engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Heilbronn's gender.

D399880/FL3345

288.    After Heilbronn raised a complaint about ITN paying her unequally based upon her gender Sulema and ITN began to retaliate against Heilbronn by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

289.    Heilbronn has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

290.    Defendants have willfully violated Heilbronn's rights under the New York Equal Pay Law and as a result are liable for liquidated damages.

## AS AND FOR A TWENTY-THIRD CAUSE OF ACTION ON BEHALF OF AMMER
### (Violation of N.Y. Labor Law § 194 as against Sulema and ITN)

291.    Ammer repeats, realleges and reiterates the allegations in paragraphs 1 through 290 as if more fully set forth herein.

292.    Beginning in January 2022, Ammer engaged in protected activity by complaining to Sulema, the CFO and CEO of ITN about unequal pay based upon Ammer's gender.

293.    After Ammer raised a complaint about ITN paying her unequally based upon her gender Sulema and ITN began to retaliate against Ammer by altering the terms and conditions of her employment and by exposing her to bullying and harassing conduct.

294.    Ammer has suffered damages as a result of Defendants' unlawful retaliatory actions in an amount to be determined at trial but no less than $500,000.

295.    Defendants have willfully violated Ammer's rights under the New York Equal Pay Law and as a result are liable for liquidated damages.

D399880/FL3345

## JURY DEMAND

The Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully demand a Judgement be entered as follows:

1.      On the first cause of action for violation of the EPA an amount to be determined at trial but not less than $750,000.00.

2.      On the second cause of action for violation of the EPA an amount to be determined at trial but not less than $750,000.00.

3.      On the third cause of action for a violation of the EPA an amount to be determined at trial but not less than $750,000.00.

4.      Liquidated damages on the first through third causes of action.

5.      On the fourth cause of action under the New York Labor Law an amount to be determined at trial but not less than $750,000.00.

6.      On the fifth cause of action under the New York Labor Law an amount to be determined at trial but not less than $750,000.00.

7.      On the sixth cause of action under the New York Labor Law an amount to be determined at trial but not less than $750,000.00.

8.      On the seventh cause of action under the New York City Administrative Code an amount to be determined at trial but not less than $750,000.00.

9.      On the eighth cause of action under the New York City Administrative Code an amount to be determined at trial but not less than $750,000.00.

10.      On the ninth cause of action under the New York City Administrative Code an amount to be determined at trial but not less than $750,000.00.

D399880/FL3345

11.     On the tenth cause of action under the Equal Pay Act for a declaration that Sulema is individually liable to the Plaintiffs as an employer.

12.     On the eleventh cause of action under the New York City Administrative Code for a declaration that Sulema is individually liable to the Plaintiffs as an employer.

13.      On the twelfth cause of action for retaliation under the Equal Pay Act for a judgment to be determined at trial but not less than $500,000.00

14.     On the thirteenth cause of action for retaliation under the Equal Pay Act for judgment to be determined at trial but not less than $500,000.00

15.     On the fourteenth cause of action for retaliation under the Equal Pay Act for a judgment to be determined at trial but not less than $500,000.00

16.     Liquidated damages on the twelfth through fourteenth causes of action.

17.     On the fifteenth cause of action for retaliation under the New York City Administrative Code for a judgment to be determined at trial but not less than $500,000.00.

18.     On the sixteenth cause of action for retaliation under the New York City Administrative Code for a judgment to be determined at trial but not less than $500,000.00.

19.     On the seventeenth cause of action for retaliation under the New York City Administrative Code for a judgment to be determined at trial but not less than $500,000.00.

20.     On the eighteenth cause of action under the New York State Human Rights Law an amount to be determined at trial but not less than $750,000.00.

21.     On the nineteenth cause of action under the New York State Human Rights Law an amount to be determined at trial but not less than $750,000.00.

22.     On the twentieth cause of action under the New York Equal Pay Law an amount to be determined at trial but not less than $750,000.00.

D399880/FL3345

23.    On the twenty-first cause of action for retaliation under the New York Equal Pay Law for a judgment to be determined at trial but not less than $500,000.00.

24.    On the twenty-second cause of action for retaliation under the New York Equal Pay Law for a judgment to be determined at trial but not less than $500,000.00.

25.    On the twenty-third cause of action for retaliation under the New York Equal Pay Law for a judgment to be determined at trial but not less than $500,000.00.

26.    Equitable relief under the Equal Pay Act requiring ITN to pay the Plaintiffs equally with their male counterparts.

27.    An award of attorneys' fees under the Equal Pay Act, New York Labor Law and the New York City Administrative Code.

28.    Punitive damages in an amount to be determined at trial.

29.    Reasonable costs and disbursements incurred in prosecuting this action.

30.    Such other and further relief as the Court deems just and proper.


Dated: Lake Success, New York
       June 15, 2022

                                   Yours, etc.
                                   HARFENIST KRAUT & PERLSTEIN, LLP

                         By:    _____*Steven J. Harfenist*_____
                                   Steven J. Harfenist
                                   *Attorneys for Plaintiffs*
                                   3000 Marcus Avenue, Suite 2E1
                                   Lake Success, New York 11042
                                   T: (516) 355-9600
                                   F: (516) 355-9601
                                   E: SHarfenist@hkplaw.com